# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| _____ | |
| Irving Levine Automotive Distributors, Inc., : | |
| individually and behalf of all others similarly : | |
| situated, : | Civil Action No. 15-cv-13634 |
|        Plaintiff, : | |
|     v. : | |
| : | |
| Hitachi, Ltd., Hitachi Automotive Systems, : | |
| Ltd., Hitachi Automotive Systems Americas, : | |
| Inc., Denso Corporation, Denso International : | |
| America, Inc., Denso International Korea : | |
| Corporation, Denso Products and Services : | |
| Americas, Inc., f/k/a Denso Sales California, : | |
| Inc., Mitsubishi Electric Corporation, : | |
| Mitsubishi Electric US Holdings, Inc. : | |
| Mitsubishi Electric Automotive America, Inc., : | |
| Robert Bosch GmbH, Robert Bosch LLC, : | |
| Mitsuba Corporation and American Mitsuba : | |
| Corporation, : | |
| : | |
|        Defendants. : | |
| _____: | |

## CLASS ACTION COMPLAINT

Plaintiff Irving Levine Automotive Distributors, Inc., individually and on behalf of a proposed class of direct purchasers of Alternators, brings this class action against Defendants under the federal antitrust laws for treble damages and alleges as follows.

### NATURE OF THE CASE

1.       Beginning at least as early as January 2000, the Defendants—United States and global manufacturers and suppliers of Alternators—violated the antitrust laws by entering into a continuing conspiracy to rig bids and fix, raise, maintain, or stabilize prices of Alternators sold in the United States and elsewhere at supra-competitive levels.  As a result of Defendants' unlawful

conduct, Plaintiff and other Class members paid artificially inflated prices for Alternators and have suffered antitrust injury to their business or property.

2.      A criminal investigation of price fixing in the motor vehicle parts industry by the U.S. Department of Justice Antitrust Division has resulted in Defendants Hitachi Automotive Systems, Ltd., and Mitsubishi Electric Corporation, global manufacturers of Alternators, pleading guilty to criminal antitrust violations with respect to Alternators and other automotive parts.

3.      Plaintiff brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 (the "Sherman Act") and Section 4 of the Clayton Act, 15 U.S.C. § 15 (the "Clayton Act"), and asserts the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiff, which are based upon personal knowledge.  Plaintiff's information and belief are based upon, *inter alia*, the investigation made by its attorneys.

## DEFINITIONS

4.      An "Alternator" is an electromechanical device that generates an electric current while an engine is in operation.  The Alternator provides power to a vehicle's electrical system and charges its battery.

5.      The "Class Period" is from at least as early as January 2000 to the present.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action to recover treble damages, and costs of suit, and reasonable attorneys' fees resulting from Defendants' violations of the Sherman Act, 15 U.S.C. § 1.

7.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

8.     Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in, are licensed to do business in, are doing business in, had agents in, are found in, or transact business in this District.

9.     The activities of Defendants and their co-conspirators were within the flow of, and were intended to and did have a substantial effect on, the interstate commerce of the United States.

10.     This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District, (b) manufactured, sold, shipped, and delivered substantial quantities of Alternators throughout the United States, including in this District, (c) had substantial contacts with the United States, including in this District, and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this District.

**THE PARTIES**

11.     Plaintiff Irving Levine Automotive Distributors, Inc. is a Connecticut corporation with its principal place of business in Danbury, Connecticut.  Plaintiff purchased Alternators directly from one or more of the Defendants during the Class Period.

*The Hitachi Defendants*

12.     Defendant Hitachi, Ltd., is a Japanese corporation with its principal place of business in Tokyo, Japan.

13.     Defendant Hitachi Automotive Systems, Ltd., is a Japanese corporation with its principal place of business in Tokyo, Japan.

14.     Defendant Hitachi Automotive Systems Americas, Inc., is a Delaware corporation with its principal place of business in Harrodsburg, Kentucky.  It is owned and controlled by Hitachi Automotive Systems, Ltd.

*The Denso Defendants*

15.     Defendant Denso Corporation is a Japanese corporation with its principal place of business in Kariya, Japan.

16.     Defendant Denso International America, Inc., is a Delaware corporation with its principal place of business in Southfield, Michigan.  It is owned and controlled by Denso Corporation.

17.     Defendant Denso International Korea Corporation is a Korean corporation with its principal place of business in Uiwang-si, South Korea.  It is owned and controlled by Denso Corporation.

18.     Defendant Denso Products and Services Americas, Inc. (f/k/a Denso Sales California, Inc.) is a corporation with its principal place of business in Long Beach, California. It is owned and controlled by Denso Corporation.

*The Mitsubishi Defendants*

19.     Defendant Mitsubishi Electric Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.

20.     Defendant Mitsubishi Electric US Holdings, Inc., is a Delaware corporation with its principal place of business in Cypress, California.  It is owned and controlled by Mitsubishi Electric Corporation.

21.     Defendant Mitsubishi Electric Automotive America, Inc., is a Delaware corporation with its principal place of business in Mason, Ohio.  It is owned and controlled by Mitsubishi Electric Corporation.

*The Bosch Defendants*

22.     Defendant Robert Bosch GmbH is a privately held German company with its principal place of business in Stuttgart, Germany.

23.     Defendant Robert Bosch LLC is a Delaware limited liability company with its principal place of business in Farmington Hills, Michigan.  It is owned and controlled by Robert Bosch GmbH.

*The Mitsuba Defendants*

24.     Defendant Mitsuba Corporation is a Japanese corporation with its principal place of business in Gunma, Japan.

25.     Defendant American Mitsuba Corporation is an Illinois corporation with its principal place of business in Novi, Michigan.   It is owned and controlled by Mitsuba Corporation.

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

26.     The acts alleged in this Complaint to have been done by Defendants Hitachi Automotive Systems Americas, Inc., Denso International America, Inc., Denso International Korea Corporation, Denso Products and Services Americas, Inc., Mitsubishi Electric US

Holdings, Inc., Mitsubishi Electric Automotive America, Inc., Robert Bosch LLC, and American Mitsuba Corporation were authorized, ordered and condoned by their parent companies.

27.     The acts alleged to have been done by the Defendants were authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

28.     Other persons or firms not named as defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not the conspirators are named as defendants in this Complaint.

29.     Each Defendant acted as a principal or an agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint.

### INTERSTATE TRADE AND COMMERCE

30.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

31.     During the Class Period, Defendants manufactured, sold and shipped substantial quantities of Alternators in a continuous and uninterrupted flow of interstate and foreign commerce.

### THE WORLDWIDE AND U.S. ANTITRUST INVESTIGATIONS INTO PRICE FIXING IN THE MOTOR VEHICLE PARTS INDUSTRY

32.     According to the United States Department of Justice ("DOJ"), the motor vehicle parts investigation, of which Alternators are a part, is the "largest criminal investigation the [DOJ] has ever pursued," both in terms of scope and potential volume of commerce affected by the alleged illegal conduct.

33.     With respect to the United States price-fixing investigation, in February 2010, the same month that Japanese and European authorities conducted raids, FBI investigators executed warrants and searched the offices of three Japanese motor vehicle part makers in metropolitan Detroit.  Defendant Denso International America, Inc., was among the companies searched.

34.     Commenting on her division's investigation, Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division, stated that "[a]s a result of this international price-fixing and bid-ridding conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers."  She further stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

35.     "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," said FBI's Special Agent in Charge Andrew G. Arena.  "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

36.     In July 2011, the Japan Fair Trade Commission ("JFTC") raided seven Japanese auto parts makers, including Defendant Denso Corporation.  The JAPAN TIMES reported that the JFTC "suspects the parts manufacturers had meetings from 2002 or earlier to set parts prices and decided which companies would win contracts before bidding for orders from automakers."

37.     In November 2012 the JFTC issued cease-and-desist orders and fined multiple automotive parts manufacturers for conspiring to fix the prices of automotive parts, including Alternators, by rigging the bidding process for supply contracts with automobile manufacturers.

The JFTC found that the anticompetitive conduct with respect to Alternators went back to November 2000.

38.     The JFTC fined Defendant Mitsubishi Electric Corporation $17.2 million for its participation in the conspiracy to fix prices for automotive parts, including Alternators, and required Mitsubishi to implemental internal reforms.

39.     The JFTC also found that Defendants DENSO Corporation, Hitachi Ltd., and Hitachi Automotive Systems, Ltd. had unlawfully fixed the prices of Alternators and other parts.

40.     To date, 37 companies and 55 executives have pleaded guilty, agreed to plead guilty, or been charged in the DOJ's ongoing investigation into price fixing and bid rigging in the motor vehicle parts industry and have agreed to pay a total of $2.6 billion in criminal fines.

## ALTERNATORS

41.     The market for the sale of Alternators to OEMs in the United States in 2011 was approximately $128 million.

42.     Alternators manufactured, distributed or sold by Defendants during the Class Period are not functionally distinguishable from each other in any material respect.

43.     Alternators are installed by motor vehicle original equipment manufacturers ("OEMs") in new motor vehicles as part of the manufacturing process.  They are also installed in motor vehicles to replace worn out, defective, or damaged Alternators.

44.     OEMs include the Big Three in Detroit (General Motors, Ford and Chrysler) and non-domestic companies that also operate manufacturing plants in the U.S.  For example, during the Class Period, Nissan manufactured motor vehicles in Mississippi and Tennessee, Toyota in Kentucky, BMW in South Carolina, Honda in Ohio and Alabama, Hyundai and Mercedes-Benz

in Alabama, and Kia in Georgia.  In addition to OEMs, distributors, such as Plaintiff, purchased Alternators directly from Defendants.

45.     When purchasing Alternators, OEMs issue Requests for Quotation ("RFQs") to motor vehicle parts suppliers.  For automotive OEMs, the bidding process begins approximately three years prior to the start of production of a new model platform.  In response, motor vehicle parts suppliers submit quotations or bids and the OEM usually awards the business to the selected motor vehicle part supplier for the anticipated production cycle of the platform, usually four to six years.  Japanese OEMs procure parts for U.S.-manufactured motor vehicles both in Japan and the United States.

46.     Defendants and their co-conspirators supplied Alternators to OEMs for installation in motor vehicles manufactured and sold in the United States and elsewhere.  The Defendants and their co-conspirators manufactured Alternators (a) in the United States for installation in motor vehicles manufactured and sold in the United States, (b) in Japan and elsewhere for export to the United States and installation in motor vehicles manufactured and sold in the United States, and (c) in Japan for installation in motor vehicles manufactured in Japan for export to and sale in the United States.

47.     During the Class Period, Defendants sold Alternators directly to OEMs, suppliers to OEMs, distributors, and other purchasers.

48.     During the Class Period, Defendants, who in a competitive market would be horizontal competitors, engaged in a conspiracy to rig bids for and to raise, fix, maintain, or stabilize prices of Alternators.  As a result of their unlawful conduct, Defendants did not compete, but instead conducted their business insulated from competition.

## THE CHARACTERISTICS OF THE MARKET
## FOR ALTERNATORS ARE CONDUCIVE TO COLLUSION

49.     In addition to the Hitachi and Mitsubishi guilty pleas, several important economic characteristics of the market for Alternators render it plausible that there was collusion among Alternators suppliers.

### *High Barriers to Entry*

50.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing.  New entrants would, in turn, decrease the market power of the co-conspirators and diminish their ability to successfully maintain supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely.  Therefore, high barriers to entry help facilitate a cartel.

51.     There are high barriers to entry in the market for Alternators.  Entry requires a company to incur significant start-up capital expenditures.  A new entrant into the business would have to incur millions of dollars in costs, including capital expenditures on plants and equipment, as well as transportation, electricity, infrastructure for distribution, and labor.  A new entrant would also have to have assured relationships with significant customers in order to justify its substantial investments of capital.

### *Price Inelasticity*

52.     When a seller of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic.  Otherwise, increased prices would result in declining sales, revenues, and profits.

53.     Alternators are required for vehicles that use them; there are no viable substitute products.  Therefore, pricing for Alternators is highly inelastic.

*Opportunities for Collusion*

54.     Defendants attended industry events that created opportunities to conspire.  Such industry events have provided myriad opportunities to meet, conspire, and share information.

## DEFENDANTS' ANTITRUST CONSPIRACY

55.     During the Class Period, Defendants conspired to rig bids for, to allocate the supply of, and to raise, fix and maintain prices for Alternators sold in or into the United States.

56.     Defendants and their co-conspirators engaged in anticompetitive conduct in furtherance of the alleged conspiracy, as described below.

57.     Defendants and their co-conspirators participated in meetings, conversations, and communications in the United States and Japan to discuss bids and price quotations for Alternators sold in or into the United States.

58.     Defendants and their co-conspirators agreed during those meetings, conversations, and communications to allocate among themselves the supply of Alternators sold in or into the United States.

59.     Defendants sold Alternators to customers in the United States and elsewhere at collusive and non-competitive prices.

60.     Defendants accepted payments for Alternators sold in the United States and elsewhere at collusive and non-competitive prices.

61.     Defendants and their co-conspirators agreed during meetings, conversations, and communications to coordinate price adjustments requested by motor vehicle manufacturers.

62.     Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to motor vehicle manufacturers in the United States and elsewhere in accordance with their conspiratorial agreements.

63.     Defendants and their co-conspirators held meetings and conversations to monitor and police their bid-rigging and price-fixing conspiracy.

64.     Defendants and their co-conspirators affirmatively undertook measures to conceal their unlawful conduct.

65.     Defendants accomplished their conspiracy, in part, by rigging bids they made in response to RFQs.

66.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (1) the OEM issues the RFQ to multiple parts suppliers; (2) the suppliers submit bids; (3) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing; (4) the suppliers submit revised bids; and (5) the OEM selects the winner.

67.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

68.     When OEMs purchase Alternators directly from the supplier to whom they awarded the contract, the OEMs purchase the Alternators at the winning price.

69.     That winning price is also used when OEM suppliers that were not part of the RFQ process purchase Alternators directly from the winning bidder for incorporation into products manufactured for and sold to OEMs.  Those suppliers and other direct purchasers who directly purchase Alternators from the winning bidder pay the winning bidder at least the winning price.  The OEM price sets the floor for pricing of Alternators.

70.     Defendants' conduct persisted for at least eleven years (2000-2011).   Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that the conspiracy would have continued undetected.

71.     Defendants manipulated the RFQ process to accomplish their conspiracy.

72.     As part of their conspiracy, at times Defendants agreed to submit bids that would allow the supplier that had the existing Alternators business for a particular model to win the Alternators business for the successor model.

73.     Defendants coordinated their Alternators pricing.   They submitted responses to RFQs that incorporated changes to pricing based on the conspiratorial agreements they made with each other.   Defendants exchanged pricing information not just to ensure that the agreed-upon party would win the business, but also to ensure that the losing bidders would look competitive in order to have the opportunity to bid for future business.

74.     Defendants communicated, held meetings, and reached conspiratorial agreements in furtherance of their price-fixing conspiracy.   Defendants' activities included, but were not limited to, the following:

   a.     Agreeing to unlawfully coordinate pricing for, and allocate sales of, Alternators.   For example, in responding to RFQs, Defendants agreed that the incumbent supplier would be the preferred bidder, and to price their bids to effect this agreement.

   b.     Colluding with regard to RFQs for Alternators business by agreeing on pricing and then communicating agreed-upon prices to Defendants' subsidiaries in the U.S., where the prices were submitted collusively.

13

c.     Discussing and exchanging pricing information with regard to Alternators RFQs and reaching conspiratorial agreements with respect to RFQs by means of communications on multiple occasions to coordinate responses and exchanges and adjustments of Alternators pricing before submission to OEMs in the United States and elsewhere.

75.     Defendants and their co-conspirators knew and intended that their actions regarding their sales of Alternators to motor vehicle manufacturers would have a direct impact on prices for Alternators sold to all direct purchasers in the United States.

76.     Defendants' single price-fixing conspiracy involving Alternators impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of Alternators.

## UNITED STATES CRIMINAL CHARGES

77.     On September 26, 2013, the DOJ charged Defendant Hitachi Automotive Systems, Ltd., with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, certain automotive products sold to automobile manufacturers in the United States and elsewhere," in violation of the Sherman Act.   The criminal information defined "automotive parts" to include Alternators.

78.     According to the criminal information, Hitachi and its co-conspirators:

a.     participated in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

b.      agreed, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

c.      agreed, during those meetings, conversations, and communications, to allocate the supply of automotive parts (including Alternators) sold to automobile manufacturers in the United States and elsewhere;

d.      agreed, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

e.      submitted certain bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f.      sold automotive parts (including Alternators) to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

g.      accepted payment for automotive parts (including Alternators) sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

h.      engaged in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and,

i.      employed measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

79.     On November 6, 2013, a Plea Agreement executed by the DOJ and Hitachi Automotive Systems, Ltd., was filed in the United States District Court for the Eastern District of Michigan.  In the Plea Agreement Hitachi agreed to pay a $195 million criminal fine and plead guilty to a one-count criminal information charging it with engaging in "a combination and conspiracy to suppress and eliminate competition in the automotive parts industry"—with "automotive parts" defined to include Alternators —"by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, certain automotive products sold to automobile manufacturers in the United States and elsewhere," in violation of the Sherman Act.

80.     In addition to the criminal fine, Hitachi Automotive Systems, Ltd., has agreed that it and its subsidiaries will cooperate in the DOJ's ongoing criminal investigation.

81.     The Plea Agreement states that "automotive parts [defined to include Alternators] that were subject of the conspiracy were sold to Nissan, Honda, GM, Ford, Toyota, and others, and certain of their subsidiaries, affiliates and suppliers in the U.S. and elsewhere, by the defendant's affiliate, Hitachi Automotive Systems Americas, Inc., which is located in the Eastern District of Michigan."

82.     On September 18, 2014, the DOJ charged four Hitachi Automotive Systems, Ltd., employees with criminal violations of the Sherman Act in relation to the same conduct that underpins the company's Plea Agreement.

83.     Hitachi employees obstructed the DOJ's investigation into the company's criminal conduct.  The Hitachi plea agreement states that when "certain employees of [Hitachi] became aware of a criminal antitrust investigation" in 2010, Hitachi employees "took steps to destroy evidence of [Hitachi's] criminal activity . . . ."  Then in 2011, when Hitachi employees learned that the company was being raided by law enforcement authorities, "certain employees

16

of [Hitachi] took steps to destroy evidence" of the company's criminal activity "to prevent its discovery by law enforcement authorities."   The plea agreement further states that "[c]ertain employees involved in the efforts to destroy evidence were senior managers of [Hitachi]."

84.     Defendant Denso Corporation has pleaded guilty to a two-count criminal information and paid a total of $78 million in criminal fines.   Denso Corporation was charged with: (1) participating in a combination and conspiracy to suppress and eliminate competition in the motor vehicle parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, electronic control units sold to a motor vehicle manufacturer in the United States and elsewhere, starting at least as early as January 2000 and continuing until at least February 2010, in violation of Section 1 of the Sherman Act; and (2) participating in a combination and conspiracy to suppress and eliminate competition in the motor vehicle parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, heater control units sold to a motor vehicle manufacturer in the United States and elsewhere starting at least as early as January 2000 and continuing until at least February 2010, also in violation of the Section 1 of the Sherman Act.

85.     On January 31, 2012, Denso Corporation issued a news release stating that "to emphasize the seriousness of these matters, Denso chairman, president and certain board members and executive directors will voluntarily return 30 percent to 10 percent of their compensation for a three-month period starting in February 2012."

86.     On August 20, 2014, the National Development and Reform Commission of China announced that it had decided to impose monetary sanctions on certain automotive suppliers, including Denso Corporation, for violation of China's Anti-Monopoly Law in connection with sales of "certain automotive components."

87.     On August 21, 2014, Denso Corporation announced that it had been fined by the Ontario Superior Court of Justice for violation of the Canadian Competition Act in connection with sales in Canada of certain body electronic control units for motor vehicles.

88.     On March 26, 2015, the South Korea Fair Trade Commission fined Denso Corporation and its Korean subsidiary $1.23 million for rigging bids on exhaust gas temperature sensors.

89.     Defendant Mitsubishi Corporation has agreed to plead guilty to violating the Sherman Act and to pay a $190 million criminal fine for anti-competitive actions in the market for automotive parts (including Alternators) sold in the United States between 2000 and 2010.

90.     Mitsubishi executives Atsushi Ueda, Minoru Kurisaki, and Hideyuki Saito have been charged by the DOJ with conspiring to fix automotive part prices; Kurisaki and Saito have been charged with conspiring to obstruct justice by destroying documents; and Saito has been charged with persuading or attempting to persuade others to destroy documents and data that may contain evidence of antitrust crimes in the United States.

91.     Defendant Robert Bosch GmbH has agreed to plead guilty to violations of the Sherman Antitrust Act in the sale of automobile parts and to pay a criminal fine of $57.8 million. Under the terms of its plea agreement, the company admitted that within the Class Period it had "participated in a conspiracy with other persons and entities engaged in the manufacture and sale of spark plugs, oxygen sensors, and starter motors . . . , the primary purpose of which was to allocate the supply of, rig bids for, and to fix, stabilize, and maintain the prices of, spark plugs, oxygen sensors, and starter motors sold in the United States and elsewhere."  Bosch admitted that in furtherance of the conspiracy its employees had participated in meetings and conversations where agreements were reached (*inter alia*) "to allocate the supply of starter

motors, rig bids for the sale of starter motors, and to fix, stabilize, and maintain the prices of, starter motors sold to Volkswagen AG and certain of its subsidiaries in the United States for use in certain Volkswagen vehicles assembled in the United States."

92.     Defendant Mitsuba Corporation has agreed to plead guilty to violating the Sherman Act and to pay a $135 million criminal fine for anti-competitive actions in the market for automotive parts sold in the United States between 2000 and 2010.

93.     Former Mitsuba executives Hiroyuki Komiya and Hirofumi Nakayama have been charged by the DOJ with fixing the prices of automotive parts and persuading or attempting to persuade Mitsuba employees to destroy documents and data that may contain evidence of antitrust crimes in the United States.

94.     DOJ has also charged that Mitsuba Corporation obstructed justice:

In or about February 2010, Executive A, acting on Defendant's [Mitsuba's] behalf, knowingly altered, destroyed, mutilated, concealed, covered up, falsified and made false entries in records, documents and tangible objects with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit, an investigation by the FBI and the United States Department of Justice of possible violations of U.S. antitrust law, in relation to and contemplation of such matter and case, and furthermore did order and command other employees of the Defendant to do so, in violation of 18 U.S.C. § 1519.

After becoming aware of the FBI search of Defendant's co-conspirator's U.S. offices, Executive A informed certain of his subordinates employed at the U.S. subsidiary of Defendant about the FBI search, and instructed such subordinates, as well as other employees of Defendant, to locate, conceal and destroy documents and electronic files that were likely to contain evidence of antitrust crimes in the United States and elsewhere.

Executive A concealed and destroyed documents and electronic files in his possession, custody and control in the Eastern District of Michigan that were likely to contain evidence of antitrust crimes in the United States and elsewhere. Certain of Executive A's subordinates and other employees of Defendant took acts in the Eastern District of Michigan and elsewhere to endeavor to conceal and destroy such documents and electronic files in the possession, custody and control of Defendant, and did conceal and destroy such documents and electronic files.

## CLASS ACTION ALLEGATIONS

95.     Plaintiff brings this action on behalf of itself, and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as the representative of a Class defined as follows:

> All direct purchasers of motor vehicle Alternators in the United States from any of the Defendants (or their controlled subsidiaries, affiliates, or joint-ventures) between at least as early as January 2000 and the present.

96.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable.   While the exact number of Class members is unknown to Plaintiff, it is believed to be in the hundreds.   The identity of the members of the Class can be readily determined from information and records Defendants possess.

97.     Plaintiff's claims are typical of the claims of the members of the Class.   Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, they have paid artificially inflated prices for Alternators as a result of Defendants' anticompetitive and unlawful conduct.

98.     Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

99.     Plaintiff is represented by counsel experienced and competent in the prosecution of antitrust class action litigation.

100.     Questions of law and fact common to members of the Class predominate over questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class.   Such generally applicable conduct is inherent in Defendants' anticompetitive and unlawful conduct.

101.     There are core questions of law and fact common to the Class, such as:

a.    Whether Defendants conspired to fix, raise, maintain, or stabilize prices of, to allocate, or to rig bids for, Alternators;

b.    Who participated in the conspiracy and how long it lasted;

c.    Whether the conspiracy caused Alternators prices to be higher than they otherwise would have been;

d.    Whether Defendants' conduct caused injury to the business or property of Plaintiff and members of the Class;

e.    Whether Defendants' conduct violated Section 1 of the Sherman Act;

f.    Whether Defendants undertook actions to conceal their unlawful conspiracy; and

g.    How to measure the damages suffered by the Class.

102.    A class action is superior to the other methods available for the fair and efficient adjudication of this litigation because individual joinder of all Class members is impracticable. Individual litigation presents the potential for inconsistent judgments and would greatly increase the cost and duration of litigation for all parties and for the judicial system. A class action permits more efficient case management and offers the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

**ANTITRUST INJURY SUFFERED BY PLAINTIFF AND THE CLASS**

103.    Defendants' anticompetitive conduct has had the following effects:

a.    price competition has been restrained, suppressed, or eliminated with respect to Alternators;

b.    the prices of Alternators have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

c.      purchasers of Alternators have been deprived of free and open competition in the Alternators market.

104.   As a result of Defendants' contract, combination, or conspiracy, Plaintiff and Class members paid higher prices for Alternators than they would have in the absence of the conspiracy, and Plaintiff and Class members have sustained injury to their business or property.

## PLAINTIFF'S CLAIMS ARE TIMELY

105.   Plaintiff and the other Class members had no knowledge of the anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until September 26, 2013, at the earliest, when the DOJ announced that Defendants Hitachi Automotive Systems, Ltd. and Mitsubishi Electric Corporation would enter guilty pleas.

106.   As a result, Plaintiff and other Class members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein before that date.

107.   No information about the Alternators conspiracy was in the public domain or otherwise available to Plaintiff or the Class prior to September 26, 2013, when the DOJ filed its criminal information against Hitachi.  Prior to that time, there was insufficient information to suggest that any one of the Defendants was involved in an Alternators conspiracy.  For these reasons, the statute of limitations as to Plaintiff's and the Class's claims did not begin to run until (at the earliest) September 26, 2013.

108.   Fraudulent concealment by Defendants also tolled the statute of limitations on the claims asserted by Plaintiff and the Class until at least September 26, 2013.  Defendants affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiff and the Class, from at least as early as January 2000 through at least September 26, 2013. During that

time, Plaintiff and the Class did not learn or discover the operative facts giving rise to this Complaint.

109.    Before at least September 26, 2013, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct, and did not know before then that that they were paying supra-competitive prices for Alternators during the Class Period.  No information, actual or constructive, was ever made available to Plaintiff or other members of the Class that would have suggested that they were being injured by Defendants' unlawful conduct.

110.    The affirmative acts by the Defendants alleged herein were wrongfully concealed and carried out in a manner that precluded detection.

111.    By its very nature, Defendants' anti-competitive conspiracy was inherently self-concealing.  Because Alternators are not exempt from antitrust regulation, Plaintiff and the Class reasonably believed that the market for Alternators was competitive.

112.    Defendants represented publicly that their pricing and bidding activities were unilateral, rather than being based on anticompetitive agreements.   In making those false representations, Defendants misled Plaintiff and the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer-allocation, and price-fixing activities.

113.    Defendants' wrongful conduct was carried out in part through means and methods that were designed to prevent detection, and which for a long time succeeded in preventing detection.

114.    In particular, Defendants participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

115.    During these meetings, conversations, and communications, Defendants agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

116.    Defendants likewise agreed to allocate the supply of Alternators sold to customers in the United States and elsewhere on a model-by-model basis.

117.    Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

118.    In accordance with their agreements, Defendants submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

119.    Plaintiff and the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and to fraudulently conceal, their conduct.

120.    For these reasons, the statute of limitations applicable to Plaintiff's and the Class's claims was tolled, and did not begin to run until at least September 26, 2013.

**COUNT I: CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

121.    Plaintiff incorporates by reference the allegations set forth above as if fully set forth here.

122.    Defendants entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

123.    The acts done by each of the Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

124.    Commencing at least as early as January 2000 and continuing until the present, the exact dates being currently unknown to Plaintiff, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, or maintain prices for Alternators, creating anticompetitive effects.

125.    Defendants' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Alternators throughout the United States.

126.    As a result of the conspiracy alleged herein, the prices charged to Plaintiff and the other members of the Class for Alternators were unlawfully raised, fixed, maintained, or stabilized in the United States.

127.    The conspiracy has had the following effects:

a.      prices paid by Plaintiff and the Class for Alternators were raised to, or fixed, maintained, or stabilized at, non-competitive levels;

b.      Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Alternators; and

c.      competition in the market for Alternators has been unlawfully restrained, suppressed, or eliminated.

128.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have been damaged, and will continue to be damaged, by paying supra-competitive prices that they would not have had to pay in the absence of the unlawful conduct of Defendants as alleged herein.

129.    The conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, and respectfully requests the following relief:

A.        That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.        That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.        That Plaintiff and the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.        That Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.        That Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.        That Plaintiff and the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.        That Plaintiff and the Class receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.


Dated: October 15, 2015     /s/ David H. Fink_____
            David H. Fink (P28235)
            Darryl Bressack (P67820)
            FINK + ASSOCIATES LAW
            38500 Woodward Ave; Ste. 350
            Bloomfield Hills, MI 48304
            Telephone: (248) 971-2500
            dfink@finkandassociateslaw.com
            dbressack@finkandassociateslaw.com

            Gregory P. Hansel
            Randall B. Weill
            Jonathan G. Mermin
            Michael S. Smith
            PRETI, FLAHERTY, BELIVEAU
             & PACHIOS LLP
            One City Center
            P.O. Box 9546
            Portland, ME 04112-9546
            Telephone: (207) 791-3000
            ghansel@preti.com
            rweill@preti.com
            jmermin@preti.com
            msmith@preti.com

            Joseph C. Kohn
            William E. Hoese
            Douglas A. Abrahams
            KOHN, SWIFT & GRAF, P.C.
            One South Broad Street, Suite 2100
            Philadelphia, PA 19107
            Telephone: (215) 238-1700
            jkohn@kohnswift.com
            whoese@kohnswift.com
            dabrahams@kohnswift.com

            Steven A. Kanner
            William H. London
            Michael E. Moskovitz

FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF
   & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Carl E. Person
225 E. 36th Street – Suite 3A
New York, N.Y. 10016-3664
Telephone: (212) 307- 4444
carlpers2@gmail.com

Irwin B. Levin
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ilevin@cohenandmalad.com

Manuel J. Dominguez
COHEN MILSTEIN
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (877) 515-7955
jdominguez@cohenmilstein.com

Solomon B. Cera
CERA LLP
595 Market St., Suite 2300
San Francisco, CA 94105

Telephone: (415) 777-5189
scera@cerallp.com

*Counsel for Plaintiff Irving Levine Automotive*
*Distributors, Inc. and the Proposed Class*